**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**



AUG – 1 2018

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

ROSS A. MILLER,

    Plaintiff,

v.                                        Civil Action No. 3:17-cv-432

DISH NETWORK, L.L.C.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Defendant Dish Network, L.L.C.'s MOTION TO DISMISS (ECF No. 20). For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

### I. Procedural Context

In this action under the Fair Credit Reporting Act ("FCRA"), Plaintiff Ross A. Miller, proceeding pro se, sues Defendant Dish Network, L.L.C., on grounds related to Dish Network's allegedly improper acquisition of Miller's credit report.

Miller initially brought this suit in the General District Court of Richmond, Virginia on March 13, 2017. On June 9, 2017, Dish Network removed the case to this Court. After removal, Dish Network moved to dismiss Miller's Bill of Particulars pursuant to Fed. R. Civ. P. 12(b)(6). By MEMORANDUM ORDER (ECF No. 17) dated March 29, 2018, the Court required Plaintiff to replead his claims under Fed. R. Civ.

P. 81(c)(2).

Miller repleaded his claims on April 23, 2018. Dish Network has now moved to dismiss Miller's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

## II.  Relevant Factual Allegations

On April 4, 2015, Miller obtained his Equifax credit report. First Am. Compl. *3. He noticed a credit inquiry from Dish Network. First Am. Compl. *3. He asked that Dish Network remove the inquiry. First Am. Compl. *3. Dish Network requested detailed information, which Miller provided. First Am. Compl. *3. On July 7, 2015, Dish Network informed Miller by letter that its investigation was completed and that it had forwarded the removal request to Equifax for removal of the inquiry within 45 days. First Am. Compl. *3. On January 10, 2017, Miller again obtained his Equifax credit report, and the Dish Network inquiry was still present. First Am. Compl. *3. Miller then requested that Equifax remove the inquiry and sought to trigger a reinvestigation by Dish Network and Equifax. First Am. Compl. *3. Equifax provided a generic response, did not remove the inquiry, and there was no meaningful reinvestigation. First Am. Compl. *3. Accordingly, on January 31, 2017, Miller asked that Dish Network remove the inquiry and pay for FCRA violations. First Am. Compl. *3. Dish Network provided "a letter with the same empty verbiage as their previous letter of July 7, 2015." First Am. Compl.

2

*3. Miller followed up with a letter demanding payment for FCRA violations. First Am. Compl. *3.

Miller claims that Dish Network had no permissible purpose for obtaining his credit report. First Am. Compl. *4. He explains that he "was simply shopping and comparing rates and plans"; "merely requested information of Defendant"; and "only inquired about prices, various plans and availability of service." First Am. Compl. *5. Miller "specifically demanded that Defendant NOT pull his credit reports" and did not provide written instructions to run his credit report. First. Am. Compl. *4-5. And, he did not apply for or seek credit, employment, insurance, government licenses or benefits, or any services from Dish Network. First Am. Compl. *5, 7. Furthermore, no government agencies were involved in the pull of the credit report, and Miller was not under a court order to have his credit report shared with Dish Network. First Am. Compl. *5. Moreover, Miller never initiated a business transaction with Dish Network and there has never been an account between Miller and Dish Network. First Am. Compl. *4. Miller contends that Dish Network "had absolutely no reason even to believe it could obtain Plaintiff's credit report" and "had a specific reason NOT to believe it could or to [sic] obtain Plaintiff's credit report, because Plaintiff clearly and unequivocally denied Defendant any permission to obtain his credit report." First Am. Compl. *4-5.

3

Miller states that Dish Network has a "usual practice of obtaining credit reports of people who inquire about prices and products." First Am. Compl. *6. He notes that Dish Network "customarily certifies to the credit reporting agency that it is requesting a credit report for the purpose of a business transaction, when in fact Plaintiff did not request DISH services nor initiate any business transaction from Defendant at all." First Am. Compl. *7.

Miller alleges that Dish Network's credit inquiry "lowered his credit score, incorrectly signals to other creditors that Plaintiff is seeking credit . . . and misrepresents Plaintiff's true credit history." First Am. Compl. *7. He asserts that the inquiry was on Miller's "credit report for nearly a year," and each month served as "a separate harm to his credit scores and credit history." First Am. Compl. *8. Miller also maintains that he has expended time and money writing to credit reporting agencies and to Dish Network; "spent money on paper, envelopes, ink and postage"; "paid court filing fees"; and "spent money on parking and gas driving to court." First Am. Compl. *8-9. Additionally, Miller has suffered increased blood pressure "over the months this has been going on and other pre-existing medical conditions have been aggravated, because of the considerable length of time this matter has spanned." First Am. Compl. *9. And, he has had a "diabetic flare-up" and needed to take

4

additional blood pressure medication. First Am. Compl. *9. Furthermore, Miller has "suffered numerous negative emotions" due to Dish Network's "in-actions, misrepresentations, and deception," including "aggravation, irritation, loss of happiness and loss of enjoyment of old age, fear, worry, anger, tumult, frustration, vexation and emotional distress." First Am. Compl. *9. Finally, Miller contends that his privacy has been invaded by Dish Network. First Am. Compl. *9.[1,2]

## THE STANDARDS GOVERNING MOTIONS TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) & 12(b)(6)

Dish Network has moved to dismiss Miller's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1), on the ground that Miller does not have standing, and pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that Miller has failed to state a cognizable

---

[1] Miller also alleges that Dish Network illegally deducted money from his account and refused to refund it. First Am. Compl. *9. He avers that this violated the Electronic Funds Transfer Act, but the violations are time barred. First Am. Compl. *9. He requests that the Court refer the matter to the proper authorities. First Am. Compl. *10.

[2] In Miller's Opposition, he raises several allegations that do not appear in the First Amended Complaint. Allegations cannot be raised by way of a plaintiff's response to a motion to dismiss. See, e.g., Neal v. Patrick Henry Cmty. Coll., 4:15-cv-4, 2015 WL 5165278, at *6 (W.D. Va. Sept. 3, 2015). Accordingly, the Court does not consider such asserted facts here. Nevertheless, the Court notes that certain of those allegations suggest that Miller was engaged in more than just "comparison shopping" in reaching out to Dish Network. See Pl.'s Opp'n *8-9. The Court does not pass on that issue now, but perhaps it will be raised at the summary judgment stage.

legal claim. See Def.'s Br. 1-2.

The principles governing Fed. R. Civ. P. 12(b)(1) are well established:

> We have heretofore recognized that a defendant may challenge subject matter jurisdiction in one of two ways. First, the defendant may contend "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." When a defendant makes a facial challenge to subject matter jurisdiction, "the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." In that situation, the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction.
>
> In the alternative, the defendant can contend—as the Government does here—"that the jurisdictional allegations of the complaint [are] not true." The plaintiff in this latter situation is afforded less procedural protection: If the defendant challenges the factual predicate of subject matter jurisdiction, "[a] trial court may then go beyond the allegations of the complaint and in an evidentiary hearing determine if there are facts to support the jurisdictional allegations," without converting the motion to a summary judgment proceeding.

Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009) (citations omitted).[3] Challenges to a complaint based on standing are governed by Fed. R. Civ. P. 12(b)(1). See, e.g, Benham v. City of Charlotte,

---

[3] It is clear that Dish Network is only raising a "facial" challenge, not an evidentiary challenge. See Def.'s Br. 6-8.

635 F.3d 129, 136 n.5 (4th Cir. 2011); Pagliara v. Fed. Home Loan Mortg. Corp., 203 F. Supp. 3d 678, 683 (E.D. Va. 2016). "When a complaint is evaluated at the pleading stage . . . 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.'" Hutton v. Nat'l Bd. of Examiners in Optometry, Inc., 892 F.3d 613, 620 (4th Cir. 2017) (citations omitted).

Fed. R. Civ. P. 12(b)(6) motions are evaluated under the following standards:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." When ruling on a motion to dismiss [pursuant to Fed. R. Civ. P. 12(b)(6)], courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff.
>
> To survive a motion to dismiss, Plaintiffs' factual allegations, taken as true, must "state a claim to relief that is plausible on its face." The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." Although it is true that "the complaint must contain sufficient facts to state a claim that is plausible on its face, it nevertheless need only give the defendant fair notice of what the claim is and the grounds on which it rests." Thus, we have emphasized that "a complaint is to be construed liberally so as to do substantial justice."

Hall v. DIRECTV, LLC, 846 F.3d 757, 765 (4th Cir. 2017) (citations

omitted).

Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6), courts construe pro se complaints liberally. See Willner v. Dimon, 849 F.3d 93, 103 (4th Cir. 2017); Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 72 (4th Cir. 2016). As the Supreme Court has instructed, "[a] document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citations omitted).

## DISCUSSION

### I.    Dish Network's Fed. R. Civ. P. 12(b)(1) Motion

Dish Network's first ground for seeking to dismiss the First Amended Complaint is that Miller lacks constitutional standing. Def.'s Br. 6-8. For the reasons set out below, Miller has standing except as to the claim under the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq.

### A.    Article III Standing

The Fourth Circuit has explained the basic standards governing the doctrine of standing as follows:

> Article III of the U.S. Constitution
> limits the jurisdiction of federal courts to
> "Cases" and "Controversies." "One element of
> the case-or-controversy requirement is that
> plaintiffs must establish that they have
> standing to sue." To invoke federal
> jurisdiction, a plaintiff bears the burden of

8

establishing the three "irreducible minimum requirements" of Article III standing:

> (1) an injury-in-fact (i.e., a concrete and particularized invasion of a legally protected interest); (2) causation (i.e., a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Beck v. McDonald, 848 F.3d 262, 269 (4th Cir. 2017) (citations omitted).

The Supreme Court has defined the "injury-in-fact" element as follows:

> To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." . . .
>
> For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way."
>
> Particularization is necessary to establish injury in fact, but it is not sufficient. An injury in fact must also be "concrete." . . .
>
> A "concrete" injury must be "de facto"; that is, it must actually exist. When we have used the adjective "concrete," we have meant to convey the usual meaning of the term—"real," and not "abstract." Concreteness, therefore, is quite different from particularization.
>
> "Concrete" is not, however, necessarily synonymous with "tangible." Although tangible

9

injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.

In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles. Because the doctrine of standing derives from the case-or-controversy requirement, and because that requirement in turn is grounded in historical practice, it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts. In addition, because Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important. Thus, we said in Lujan that Congress may "elevat[e] to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." Similarly, Justice Kennedy's concurrence in that case explained that "Congress has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before."

Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation. For that reason, Robins could not, for example, allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III.

Spokeo, Inc. v. Robbins, 136 S. Ct. 1540, 1548-49 (2016) (citations

omitted).

The "causation" element "is satisfied where 'a causal connection between the injury and the conduct complained of . . . is 'fairly traceable,' and not 'the result of the independent action of some third party not before the court.''" Cooksey v. Futrell, 721 F.3d 226, 238 (4th Cir. 2013) (citations omitted). The "standard is not equivalent to a requirement of tort causation." Hutton, 892 F.3d at 623 (citations omitted).

In explaining the "redressability" element, the Fourth Circuit has held that "[a]n injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Doe v. Va. Dep't of State Police, 713 F.3d 745, 755 (4th Cir. 2013) (citations omitted).

Finally, "[t]he Supreme Court has also cautioned that the 'absence of a valid . . . cause of action' does not implicate the court's 'power to adjudicate the case.'" Beyond Sys., Inc. v. Kraft Foods, Inc., 777 F.3d 712, 716 (4th Cir. 2015) (citations omitted). It is thus important to "take care not to conflate a standing inquiry with a merits inquiry." See id.; see also Covenant Media of SC, LLC v. City of North Charleston, 493 F.3d 421, 428-29 (4th Cir. 2007).

**B. Dish Network's Arguments & Analysis**

Dish Network's standing argument can be distilled to the following: (1) most of the damages Miller alleges "are not

11

recoverable under the FCRA"; and (2) "those that are lack any causal connection with Defendant's alleged violation." See Def.'s Br. 6.

Dish Network's first argument fails, as an initial matter, because "the 'absence of a valid . . . cause of action' does not implicate the court's 'power to adjudicate the case.'" Beyond Sys., 777 F.3d at 716 (citations omitted). Dish Network "conflates two separate issues: (1) the merits, whether [Miller] has sufficiently stated a claim; and (2) jurisdiction, whether the court has the power to reach the merits of [Miller's] claim." See Green v. RentGrow, Inc., 2:16-cv-421, 2016 WL 7018564, at *7 (E.D. Va. Nov. 10, 2016), adopted, 2016 WL 7031287, at *1 (E.D. Va. Nov. 30, 2016).

Wholly apart from whether Miller's alleged damages are actually recoverable under the FCRA, it is clear that these damages are sufficient to provide Article III standing. Miller has alleged, inter alia, that Dish Network obtained Miller's credit report in violation of the FCRA, which reduced his credit score, and Miller had to spend time and money writing letters to credit reporting agencies and to Dish Network to attempt to remove the improper inquiry. See First Am. Compl. *3-4, 7-9. It is clear that a reduction in credit score constitutes an injury in fact, and numerous courts have taken that view. See, e.g., Crabtree v. Experian Info. Solutions, Inc., 16-cv-10706, 2018 WL 1872112, at *4 (N.D. Ill. Apr. 17, 2018), appeal docketed, No. 18-2191 (7th Cir. May 29, 2018); Boone v. T-Mobile USA

Inc., 17-378, 2018 WL 588927, at *8 (D.N.J. Jan. 29, 2018); Duraj v. PNC Bank, N.A., 1:17-cv-775, 2017 WL 5508380, at *2 (N.D. Ohio Nov. 15, 2017); Hickman v. Pa. Higher Educ. Assistance, 1:17-cv-388, 2017 WL 8186732, at *4 (N.D. Ga. Sept. 27, 2017) (citing Pedro v. Equifax, Inc., 868 F.3d 1275, 1280 (11th Cir. 2017)), adopted, 2017 WL 8219146, at *1 (N.D. Ga. Oct. 30, 2017); Kruckow v. Merchants Bank, 16-2418, 2017 WL 3084391, *3 n.4 (D. Minn. July 19, 2017); Ruk v. Crown Asset Mgmt., LLC, 1:16-cv-3444, 2017 WL 3085282, at *6 (N.D. Ga. Mar. 22, 2017), adopted, 2017 WL 3085686, at *3-4, 8 (N.D. Ga. June 8, 2017); Bultemeyer v. CenturyLink, Inc., 14-02530, 2017 WL 634516, at *2 (D. Ariz. Feb. 15, 2017), appeal docketed, No. 17-15858 (9th Cir. Apr. 27, 2017); Adams v. Fifth Third Bank, 3:16-cv-218, 2017 WL 561336, at *3-4 (W.D. Ky. Feb. 10, 2017); Green, 2016 WL 7018564, at *7-8.[4]

---

[4] The Court has found only two cases directly holding to the contrary. See Del Llano v. Vivint Solar Inc., 17-cv-1429, 2018 WL 656094, at *6-7 (S.D. Cal. Feb. 1, 2018); Nayab v. Capital One Bank, N.A., 3:16-cv-3111, 2017 WL 2721982, at *2 (S.D. Cal. June 23, 2017), appeal docketed, No. 17-55944 (9th Cir. July 3, 2017).

In Del Llano, the court observed that there is "no clear consensus on whether the bare allegation that a plaintiff's credit score has dropped can satisfy the injury in fact requirement for Article III standing." Del Llano, 2018 WL 656094, at *7. To support the view that some courts have held that a credit score reduction is insufficient, the court cited Diedrich v. Ocwen Loan Servicing, LLC, 839 F.3d 583, 591 (7th Cir. 2016). See Del Llano, 2018 WL 656094, at *7. It then held (without citation) that "the Court is more persuaded by the Seventh Circuit as well as holdings from this district that have concluded that the drop in Plaintiff's credit

Indeed, the Fourth Circuit recently suggested, strongly, that a reduced credit score (and out of pocket costs to correct it) would suffice to establish an injury in fact. In Hutton, the Fourth Circuit held, in a case alleging several state law causes of action, that the plaintiffs had suffered a non-speculative injury in fact where a data breach allowed "fraudsters [to] use[]-and attempt[] to use-the Plaintiffs' personal information to open Chase Amazon Visa credit card accounts without their knowledge or approval." See Hutton, 892 F.3d at 616, 622. The Court of Appeals went on to state:

> By way of example, the Hutton Complaint specifies that Hutton received an unsolicited Chase Amazon Visa credit card that was applied for using her social security number and her

score is not an articulated concrete harm." Id.

Diedrich, however, in no way concluded that a credit score reduction alone would be insufficient for standing. Rather, it stated: "[i]n this case, however, the plaintiffs have alleged that they have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate. These are allegations of concrete injuries and as such are sufficient to allege standing under Twombly, Iqbal, and Spokeo." Diedrich, 839 F.3d at 591 (emphasis added). In actuality, therefore, Diedrich suggested that damaged credit might, alone, confer standing.

In Nayab, the court offered minimal analysis of the credit score issue. It simply observed that the complaint did not "allege that Nayab has been denied credit as a result of a lowering of her credit score" and that "[t]his conjectural and hypothetical future injury does not satisfy the requirements for Article III standing." Nayab, 2017 WL 2721982, at *2. The decision in no way engaged with the growing judicial consensus supporting the opposite conclusion.

Consequently, the court does not find these decisions persuasive or reflective of the prevailing judicial view on the credit score issue.

14

> maiden name . . . . Around the same time,
> Kaeochinda learned that someone had applied for
> a Chase credit card using her social security
> number and former married name. <u>Mizrahi also</u>
> <u>actually received an alert that her credit score</u>
> <u>had decreased eleven points due to a credit</u>
> <u>application that was fraudulently filed with</u>
> <u>Chase, using her address, social security</u>
> <u>number, and mother's maiden name. She had to</u>
> <u>spend time and resources to repair her credit.</u>
> The Plaintiffs do not allege that they suffered
> fraudulent charges on their unsolicited Chase
> Amazon Visa credit cards, but the Supreme Court
> long ago made clear that "[i]n interpreting
> injury in fact . . . standing [is] not confined
> to those who [can] show economic harm."

Id. at 622 (emphasis added) (citations omitted).

In short, the Fourth Circuit determined that a data breach
resulting in actual identity theft constitutes an injury in fact,
and that it especially does so where it <u>reduces a party's credit score</u>
<u>and requires that party to spend time and resources to repair her</u>
<u>credit</u>. In so holding, moreover, the Fourth Circuit necessarily
rejected the district court's view "that the Plaintiffs had failed
to sufficiently allege that they suffered an injury-in-fact
because . . . the Plaintiffs had 'incurred no fraudulent charges'
and 'had not been denied credit or been required to pay a higher
interest rate for credit they received.'" See Hutton, 892 F.3d at
619 (emphasis added) (citations omitted). Thus, the Fourth Circuit
took the view that a reduction in credit score (without a resulting
denial of credit or higher interest rate) could serve as an injury
in fact, and the Court can discern no reason why that view would not

15

apply in the FCRA context. Indeed, the Court of Appeals in Hutton did not distinguish, in its standing analysis, among the several causes of action raised. See id. at 616.[5]

Dish Network's first argument also fails because Miller alleges that Dish Network's actions resulted in "aggravation, irritation, loss of happiness and loss of enjoyment of old age, fear, worry, anger, tumult, frustration, vexation and emotional distress." First Am. Compl. *9. Emotional distress has been found to constitute an injury in fact under the FCRA. See Adan v. Insight Investigation, Inc., 16-cv-2807, 2018 WL 467897, at *6 (S.D. Cal. Jan. 18, 2018); Lovess v. Embrace Home Loans, Inc., 17-2212, 2017 WL 4745452, at *2 (D. Md. Oct. 20, 2017); Ricketson v. Experian Info. Solutions, Inc., 266 F. Supp. 3d 1083, 1090-91 (W.D. Mich. 2017). And, the Fourth Circuit has determined (in unpublished decisions) that emotional damages can support an injury in fact under the Fair Debt Collection Practices Act ("FDCPA"), using generalized reasoning applicable to other contexts. See Moore v. Blibaum & Assocs., P.A., 693 F. App'x 205, 206 (4th Cir. 2017) (per curiam) ("This was not a case where

---

[5] Dish Network claims that out of pocket expenses incurred to notify a credit reporting agency of an error (in contrast to those expended to enforce compliance with a particular provision of the FCRA) are not compensable as actual damages. Def.'s Br. 7. That may well be true, but, as suggested by Hutton, out of pocket expenses can serve as a sufficient injury to confer standing, at least "when a substantial risk of harm actually exists." See Hutton, 892 F.3d at 622.

16

the plaintiff simply alleged 'a bare procedural violation [of the FDCPA], divorced from any concrete harm.' Indeed, Moore alleged in her complaint that as a consequence of B & A's alleged violations of the FDCPA's proscribed practices, she 'suffered and continues to suffer' from 'emotional distress, anger, and frustration.' Moore therefore established the existence of an injury in fact[.]" (citations omitted)); Ben-Davies v. Blibaum & Assocs., P.A., 695 F. App'x 674, 676-77 (4th Cir. 2017) (per curiam) (similar). This Court has reached the same conclusion in the FDCPA context, likewise employing a generally applicable characterization. See Brown v. R & B Corp. of Va., 267 F. Supp. 3d 691, 697 (E.D. Va. 2017) ("When a plaintiff alleges an actual intangible injury such as emotional distress, a plaintiff has sufficiently alleged a concrete intangible injury."). Furthermore, emotional distress is cognizable as actual damages under the FCRA. See Robinson v. Equifax Info. Servs., LLC, 560 F.3d 235, 239 (4th Cir. 2009); see also Alston v. Freedom Plus/Cross River, 17-0033, 2018 WL 770384, at *6 (D. Md. Feb. 7, 2018). [6] Thus, at minimum, emotional distress is a concrete,

_____

[6] Dish Network argues that courts only allow emotional distress damages under the FCRA where the plaintiff has shown that his credit information was shared with a third party. See Def.'s Br. 6. Nothing in case law within the Fourth Circuit suggests that to be true. See, e.g., Freedom Plus/Cross River, 2018 WL 770384, at *4-7; see also Burke v. Experian Info. Solutions, Inc., 1:10-cv-1064, 2011 WL 1085874, at *1-3, 8 (E.D. Va. Mar. 18, 2011).

17

intangible injury that Congress has identified as "meet[ing] minimum Article III requirements." See Spokeo, 136 S. Ct. at 1543.[7]

In sum, Miller has alleged damages that are sufficient to establish an injury in fact, and Dish Network's assertion that those damages are not cognizable in no way defeats that conclusion.[8]

Dish Network's second argument, i.e., that Miller's claimed damages do not satisfy the "causation" element of standing, also fails. Miller directly asserts that "Defendant's credit inquiry on Plaintiff's credit report lowered his credit score." First Am. Compl. *7. And, Miller claims that his emotional harms were the "result of Defendant's actions, in-actions, misrepresentations, and deception." First Am. Compl. *9. Construing Miller's First Amended Complaint liberally, it is fairly inferable that those harms stemmed from Dish Network's alleged violations of the FCRA. In short, it is

---

[7] The interpretation of "actual damages" under the FCRA as including emotional harm is longstanding. See Sloane v. Equifax Info. Servs., LLC, 510 F.3d 495, 500 (4th Cir. 2007) (citing cases supporting this interpretation dating back to 1974). In Section 312(f) of the Fair and Accurate Credit Transactions Act of 2003, which amended the FCRA, Congress expressly stated that "[n]othing in this section, the amendments made by this section, or any other provision of this Act shall be construed to affect any liability under section 616 or 617 of the Fair Credit Reporting Act (15 U.S.C. 1681n, 1681o) that existed on the day before the date of enactment of this Act." Fair and Accurate Credit Transactions Act of 2003, Pub. L. No. 108-159, § 312(f), 117 Stat. 1952, 1993 (2003). It seems clear that Congress has adopted the prevailing interpretation of "actual damages."

[8] There can be no argument that the harms alleged here are not "particularized," as Miller clearly claims that his credit score was lowered and that he experienced emotional distress.

18

impossible to conclude that there is not "a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." See Beck, 848 F.3d at 269 (citations omitted); see also Cooksey, 721 F.3d at 238.[9,10] Hence, the Court will deny Dish Network's motion to dismiss on standing grounds as to Miller's FCRA claims.

## C. Electronic Funds Transfer Act Violations

Miller asks the Court to refer Dish Network to the proper authorities for its alleged violations of the EFTA. First Am. Compl. *9-10. Miller has no standing to seek that relief, however, because a favorable decree would not redress his injuries without (speculative) third-party intervention. See Doe, 713 F.3d at 755-57. Although Dish Network only touches on this issue in passing, see Def.'s Br. 1, "[w]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider sua sponte issues that the parties have disclaimed or have not presented," United States v. Wilson, 699 F.3d 789, 793 (4th Cir. 2012) (citations omitted).

---

[9] There is no assertion, nor could there be any assertion, that a favorable decree of damages, costs, and fees (the main relief Miller seeks) could not remedy Miller's injuries. See First Am. Compl. *10.

[10] Dish Network cites Dilday v. Directv, LLC, 3:16-cv-996, 2017 WL 1190916 (E.D. Va. Mar. 29, 2017), to support its overall argument that Miller has failed to show standing. Def.'s Br. 8. In that case, however, "the Complaint [was] devoid of any reference to Plaintiff suffering any harm as a result of these violations or his susceptibility to the risk of real harm in the future." Dilday, 2017 WL 1190916, at *3. That is not the case here, so Dilday is inapposite.

Consequently, the Court will grant Dish Network's motion to dismiss as to Miller's requested relief for violations of the EFTA.

## II.   Dish Network's Fed. R. Civ. P. 12(b)(6) Motion

Dish Network's alternative ground for seeking to dismiss the First Amended Complaint is that Miller fails to state a claim under 15 U.S.C. §§ 1681b(f) and 1681n(b). Def.'s Br. 8-12. The Court disagrees with Dish Network's arguments as to 15 U.S.C. § 1681b(f) but will dismiss any claims under 15 U.S.C. § 1681n(b).

### A.   The 15 U.S.C. § 1681b(f) Claim

#### 1.   The Basic Framework

15 U.S.C. § 1681b(f) states the following:

> A person shall not use or obtain a consumer report for any purpose unless--
>
> (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and
>
> (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific certification.

15 U.S.C. § 1681b(f).

The "purpose[s] for which [a] consumer report is authorized to be furnished" are set forth at 15 U.S.C. § 1681b(a), which provides, in relevant part:

> Subject to subsection (c), any consumer reporting agency may furnish a consumer report

20

under the following circumstances and no other:

. . . .

(3) To a person which it has reason to believe--

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

. . . .

(F) otherwise has a legitimate business need for the information--

(i) in connection with a business transaction that is initiated by the consumer . . . .

15 U.S.C. § 1681b(a).[11]

---

[11] The full provision reads:

Subject to subsection (c), any consumer reporting agency may furnish a consumer report under the following circumstances and no other:

(1) In response to the order of a court having jurisdiction to issue such an order, or a subpoena issued in connection with proceedings before a Federal grand jury.

(2) In accordance with the written instructions of the consumer to whom it relates.

(3) To a person which it has reason to believe--

(A) intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer; or

(B)   intends to use the information for employment purposes; or

(C)   intends to use the information in connection with the underwriting of insurance involving the consumer; or

(D)   intends to use the information in connection with a determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; or

(E)   intends to use the information, as a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; or

(F)   otherwise has a legitimate business need for the information--

   (i)   in connection with a business transaction that is initiated by the consumer; or

   (ii)  to review an account to determine whether the consumer continues to meet the terms of the account.

(G)   executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards.

(4)   In response to a request by the head of a State or local child support enforcement agency (or a State or local government official authorized by the head of such an agency), if the person making the request certifies to the consumer reporting agency that--

(A)   the consumer report is needed for the purpose of establishing an individual's capacity to make child support payments, determining the appropriate level of such payments, or enforcing a child support order, award, agreement, or judgment;

(B)   the parentage of the consumer for the child to which the obligation relates has been established or acknowledged by the consumer in accordance with State laws under which the

In assessing claims under this statutory framework, courts have consistently held that the elements of a claim under 15 U.S.C. § 1681b(f) include the following: "(1) there was a consumer report; (2) obtained or used by the defendant; (3) without a permissible purpose as defined in § 1681b(a)(1)-(6); and (4) the defendant acted with the specified mental state." See Freedom Plus/Cross River, 2018 WL 770384, at *4; see also Wyche v. Kuchinsky, 3:16-cv-114, 2017 WL 2222376, at *7 (E.D. Va. May 19, 2017); Cole v. Capital One, 15-1121, 2016 WL 2621950, at *4 (D. Md. May 5, 2016); Glanton v. DirecTV, LLC, 172 F. Supp. 3d 890, 894 (D.S.C. 2016).

---

obligation arises (if required by those laws); and

(C)   the consumer report will be kept confidential, will be used solely for a purpose described in subparagraph (A), and will not be used in connection with any other civil, administrative, or criminal proceeding, or for any other purpose.

(D)   Redesignated (C)

(5)   To an agency administering a State plan under section 654 of Title 42 for use to set an initial or modified child support award.

(6)   To the Federal Deposit Insurance Corporation or the National Credit Union Administration as part of its preparation for its appointment or as part of its exercise of powers, as conservator, receiver, or liquidating agent for an insured depository institution or insured credit union under the Federal Deposit Insurance Act or the Federal Credit Union Act, or other applicable Federal or State law, or in connection with the resolution or liquidation of a failed or failing insured depository institution or insured credit union, as applicable.

### 2. **Dish Network's Arguments & Analysis**

The core question is whether Miller has alleged that Dish Network had no permissible purpose to obtain his credit report. Dish Network bases its entire Fed. R. Civ. P. 12(b)(6) motion as to the 15 U.S.C. § 1681b(f) claim on that issue. See Def.'s Br. 8-11.

### i. **The Reason to Believe Standard**

Dish Network first argues that a user of a credit report need only have a "reasonable belief" that it had a permissible purpose for obtaining it. Def.'s Br. 9-10; Def.'s Reply Br. 3. The Court concurs (as to permissible purposes under 15 U.S.C. § 1681b(a)(3)).

It is true that, as Miller contends, 15 U.S.C. § 1681b(a)(3) refers to the reasonable belief of the credit reporting agency, not the user of the credit report. See 15 U.S.C. § 1681b(a)(3); Pl.'s Opp'n *2, 6-7. However, courts within the Fourth Circuit have consistently applied the "reason to believe" standard to users of credit reports as well. See, e.g., Glanton, 172 F. Supp. 3d at 895-96; Danehy v. Jaffe & Asher, LLP, 5:14-cv-60, 2015 WL 1249879, at *5 (E.D.N.C. Mar. 17, 2015); Frazier v. RJM Acquisitions LLC, 14-0047, 2015 WL 795078, at *3 (D. Md. Feb. 24, 2015); Howard v. GE Money, 1:12-cv-895, 2014 WL 6810764, at *6 (M.D.N.C. Dec. 2, 2014); Bracken v. Fannie Mae Consumer Res. Ctr. Inc., 6:13-1983, 2014 WL 5527837, at *7 (D.S.C. Oct. 31, 2014); Alston v. Cent. Credit Servs., Inc., 12-2711, 2013 WL 4543364, at *2-3 (D. Md. Aug. 26, 2013); Boston v.

24

_Diverse Funding Assocs., LLC_, 3:12-cv-681, 2013 WL 12146517, at *2 (W.D.N.C. Apr. 26, 2013), aff'd, 539 F. App'x 292, 292 (4th Cir. 2013) (per curiam); _Korotki v. Attorney Servs. Corp., Inc._, 931 F. Supp. 1269, 1276 (D. Md. 1996), aff'd sub nom. _Korotki v. Thomas, Ronald & Cooper, P.A._, 131 F.3d 135, 1997 WL 753322, at *2-3 (4th Cir. 1997) (per curiam) (table). Courts outside the Fourth Circuit have done so as well. See, e.g., _Foote v. Continental Serv. Grp._, 6:18-cv-73, 2018 WL 3008880, at *2 (M.D. Fla. June 16, 2018); _Kruckow v. Merchants Bank_, 16-2418, 2017 WL 5990125, at *2 (D. Minn. Dec. 1, 2017); _Bentley v. Tri-State of Branford, LLC_, 3:14-cv-1157, 2016 WL 2626805, at *2 (D. Conn. May 6, 2016); _Marcuis v. RJM Acquisitions, LLC_, 1:14-cv-2967, 2015 WL 12681657, at *5 (N.D. Ga. Oct. 23, 2015), adopted, 2015 WL 12696104, at *1 (N.D. Ga. Nov. 13, 2015); _James v. Interstate Credit & Collection, Inc._, 03-cv-1037, 2005 WL 1806501, at *3-5 (E.D. Pa. July 29, 2005).

Furthermore, although the Fourth Circuit has not ruled on the issue by published opinion, it has strongly indicated by unpublished disposition that it would hold in line with the prevailing view:

> Title 15, United States Code, Section 1681(b) permits a consumer reporting agency to furnish a report without the consumer's authorization:
>
> (3) to a person which it has reason to believe
>
> (A) intends to use the information with a credit transaction involving the consumer on

> whom the information is to be furnished and
> involving . . . collection of an account of,
> the consumer; or . . .
>
> (E) otherwise has a legitimate business
> need for the information in connection with a
> business transaction involving the consumer.[12]
>
> While this language might arguably apply
> only to consumer agencies, we conclude that the
> wording is equally applicable to a user.

Korotki, 1997 WL 753322, at *2 (emphasis added). In that case,

moreover, the Fourth Circuit, in determining that a permissible

purpose existed, found that the plaintiff had admitted certain facts,

which "[o]bviously . . created a business relationship between

the parties, and [the defendants' client] correctly believed this

to be true[.]" Id. (emphasis added). And, the Fourth Circuit's

decision affirmed the district court's view that, "so long as a user

has reason to believe that a permissible purpose exists, that user

may obtain a consumer report without violating the FCRA." See id.

at *3 ("For the foregoing reasons and the reasons set forth by the

court below, the district court's judgment is AFFIRMED." (emphasis

added)); Korotki, 931 F. Supp. at 1276.[13]

---

[12] Note that this passage reflects language from a previous version of the FCRA. That does not affect the analysis here.

[13] The Court is mindful of Cappetta v. GC Services Ltd., 654 F. Supp. 2d 453 (E.D. Va. 2009), in which a court in this district observed that the Fourth Circuit in Korotki did "not expressly adopt the district court's language in Korotki 1 to state that a user may obtain a consumer report where it has reason to believe a permissible purpose

The Court respects the clear weight of authority and the guidance of the Fourth Circuit on this issue. Accordingly, the Court concludes that a user of a consumer report has a permissible purpose under 15 U.S.C. § 1681b(a)(3) if that user has a "reason to believe" that it has a permissible purpose.

However, it is important to note that the "reason to believe" standard does not save a defendant from ambiguity in the law (e.g., what conduct legally constitutes a "credit transaction involving the consumer" or a "business transaction that is initiated by the consumer"). See 15 U.S.C. § 1681b(a)(3). Rather, the standard operates to provide a defendant with a legally permissible purpose where the facts would reasonably lead it to believe that it had such a purpose (e.g., that the plaintiff owed a debt to the defendant). See, e.g., Glanton, 172 F. Supp. 3d at 896 ("Courts have reached the conclusion that there is no violation of Section 1681b when a creditor obtains a credit report due to an imposter's application for credit even though the identity theft victim did not make the application."); Danehy, 2015 WL 1249879, at *6 ("Plaintiff has failed to allege any facts from which the court may conclude defendant J & A did not have reason to believe they were collecting on a delinquent

therein enumerated exists" and "did not need to reach that specific question to affirm summary judgment." Id. at 460. However, the Court takes the view that the Fourth Circuit's language was sufficient to show that it was adopting the district court's "reason to believe" standard, and it finds Cappetta to be unpersuasive to the extent that it holds to the contrary.

account on behalf of American Express."); Frazier, 2015 WL 795078, at *3 ("The email and the declaration show that the Defendant had reason to believe a debt existed, even if the Plaintiff is correct that the debt did not exist[.]"); Bracken, 2014 WL 5527837, at *7 ("Under Section 1681b, all that is required is that Fannie Mae had 'reason to believe' that it had a permissible purpose to access Bracken's credit report, not that it was the actual owner of the account."); Cent. Credit Servs., 2013 WL 4543364, at *3 ("Here, CCS has produced evidence of a permissible purpose in accessing Plaintiff's credit report—to collect a debt that it had 'reason to believe' Plaintiff owed to RBS."); Korotki, 931 F. Supp. at 1277 ("[T]his Court concludes that the agreement between the two parties, to which plaintiff admits, gave Angelozzi reason to believe that Korotki and/or APK Development owed Angelozzi a debt."); see also Korotki, 1997 WL 753322, at *2 ("Obviously, these admitted facts created a business relationship between the parties, and Angelozzi correctly believed this to be true.").

### ii. Whether Dish Network Had a Permissible Purpose to Access Miller's Credit Report

Dish Network next argues that Miller fails to allege that Dish Network lacked a reason to believe that it had a permissible purpose to acquire his consumer report and, in fact, that his allegations show that Dish Network "did have a reasonable belief that it had a permissible purpose." Def.'s Br. 10. Specifically, Dish Network

maintains that Miller "affirmatively states that he contacted Defendant and inquired about prices, features, and product availability" and that Miller claimed that Dish Network "certified to Equifax that it had a permissible purpose to access Plaintiff's credit report." Def.'s Br. 10. These allegations, Dish Network argues, show that that it "had reason to believe that the information obtained would be used 'in connection with a credit transaction' with and 'the extension of credit to' [Miller]." Def.'s Br. 10-11 (citations omitted).[14] Those contentions are unpersuasive.

### a.    The Relevant Permissible Purposes

As an initial matter, Miller's allegations, taken as true and construed liberally, show that Dish Network cannot rely on several "permissible purposes" enumerated by 15 U.S.C. § 1681b(a). Miller avers that: (1) he was not under a court order to have his credit report pulled; (2) he did not furnish written instructions to obtain his credit report (and, in fact, denied consent to Dish Network obtaining his report); (3) he did not seek employment with Dish Network; (4) he did not apply for credit from Dish Network; (5) he did not apply for insurance from Dish Network; (6) he did not apply

---

[14] Dish Network also suggests that users of credit reports do not need "permission" to obtain them, that it is insufficient for a plaintiff to allege that he never sought to acquire services from the defendant, and that a plaintiff does not need to have direct dealings with a defendant for it to obtain a credit report lawfully. Def.'s Br. 9-10; see also Def.'s Reply Br. 3.

for any government licenses or benefits from Dish Network and government agencies were not involved; (7) there has never been an account between the parties; (8) Miller did not apply for services from Dish Network; and (9) Miller "merely requested information of Defendant," "only inquired about prices, various plans and availability of service," and "was simply shopping and comparing rates and plans." First Am. Compl. *4-5, 7. Those allegations eliminate all of the "permissible purposes" except for those under 15 U.S.C. §§ 1681b(a)(3)(A) (credit transactions) and 1681b(a)(3)(F)(i) (business transactions initiated by the consumer). That is true even for those other permissible purposes that permit a "reason to believe" exception (i.e., those under 15 U.S.C. § 1681b(a)(3)).

Accordingly, the Court will focus on whether Miller has alleged the lack of a permissible purpose under 15 U.S.C. §§ 1681b(a)(3)(A) and 1681b(a)(3)(F)(i). To those purposes we now turn.

### b. 15 U.S.C. § 1681b(a)(3)(A)

As set out above, Miller claims that there has never been any account between him and Dish Network; that he never applied for credit or services; and that he simply requested information about products and plans. First Am. Compl. *4-5. And, Miller alleges that Dish Network has a "usual practice of obtaining credit reports of people who inquire about prices and products." First Am. Compl. *6. In

30

essence, Miller contends that his only interaction with Dish Network was to engage in "comparison shopping" behavior, such as asking basic service-related questions, and that Dish Network pulled his credit report (in line with its standard practice) anyway. The question, then, is whether Miller's interactions with Dish Network (as he alleged them) fall within 15 U.S.C. § 1681b(a)(3)(A).

That section establishes a permissible purpose where a user "has reason to believe" that it "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer." See 15 U.S.C. § 1681b(a)(3)(A). As a threshold matter, it is clear that Dish Network could not have had a reasonable belief that it intended to use the credit report for "review or collection of an account of" Miller because Miller has alleged that there was never an account between the parties. Hence, all that remains is the issue of whether Dish Network had a reason to believe that it intended "to use the information in connection with a credit transaction involving the consumer . . . and involving the extension of credit to . . . the consumer." See id.

Decisions that have addressed the issue teach that a permissible purpose under 15 U.S.C. § 1681b(a)(3)(A) cannot, as a matter of law, be established where the defendant obtained a credit report in

31

response to mere comparison shopping behavior. See Boone, 2018 WL 588927, at *15-16; Qureshi v. Penkhus Motor Co., 15-cv-2337, 2016 WL 5372184, at *1-3 (D. Colo. Sept. 26, 2016); Heaton v. Soc. Fin., Inc., 14-cv-5191, 2015 WL 6744525, at *4-5 (N.D. Cal. Nov. 4, 2015); Traveler v. Glenn Jones Ford Lincoln Mercury 1987, Inc., cv-05-0817, 2006 WL 173687, at *1, 3-5 (D. Ariz. Jan. 24, 2006).

Each of these cases involved business interactions either comparable to, or that had progressed much further than, those at issue here. In Boone, for instance, the named plaintiff "asked a T-Mobile employee about available cell phone plans and rates," "did not sign any agreement, did not agree to any services," and "made it clear that he did not want his credit report accessed if a 'hard' credit inquiry would be required" (to which the employee agreed). Boone, 2018 WL 588927, at *1. T-Mobile conducted a hard inquiry anyway, and the plaintiff claimed that "T-Mobile has 'routinely and systematically' obtained such hard inquiries on prospective customers without a permissible purpose or written consent." Id. The district court held that the plaintiff had stated a claim under the FCRA. Id. at *15-16.

In Qureshi, the plaintiffs authorized the defendant, a car dealer, to access their credit report. Qureshi, 2016 WL 5372184, at *2. Six months later, the plaintiffs contacted the dealership about potentially purchasing a vehicle and proceeded fairly far in the

process. Id. at *1. A trade-in appraisal was performed, the car model of interest was specified, and the parties discussed credit information changes and the need for a down payment. Id. The court refused to grant the defendant's motion for summary judgment. Id. at *3-4.[15]

In Heaton, the plaintiffs navigated to a loan website, registered for the website, advanced through several steps, were shown loan products for which they prequalified, and, after selecting certain options, had a "hard" credit inquiry performed on them. Heaton, 2015 WL 6744525, at *1-2. The district court denied the defendants' motion for summary judgment. Id. at *4-5, 8.

In Traveler, the plaintiff received an offer for a pre-approved loan to purchase a vehicle at the defendant auto dealership. Traveler, 2006 WL 173687, at *1. She met with a salesman, received assurances that the dealership would not pull her credit, and left the dealership when she could not find a vehicle she wanted within the loan offer amount. Id. The plaintiff asserted that the salesman

---

[15] After trial, sitting as finder of fact, the court ultimately concluded that the dealership had a permissible purpose under 15 U.S.C. § 1681b(a)(3)(A). See Qureshi v. Penkhus Motor Co., 15-cv-2337, 2016 WL 6779320, at *4 (D. Colo. Nov. 16, 2016). However, what is important is that the court denied summary judgment on the facts laid out above, thus demonstrating that even those facts were sufficient, legally, to support a claim. And, in any case, the parties' interactions in Qureshi had progressed to a much more advanced stage than those alleged here (making Qureshi "a close call" even on summary judgment). See Qureshi, 2016 WL 5372184, at *3.

called several weeks later, that he explained that the loan offer

had been extended, that the plaintiff asked about vehicles within

the loan amount (but ultimately declined the vehicle discussed), and

that the plaintiff agreed that the salesman could continue looking

for a suitable car. Id. The dealership ran the plaintiff's credit

report, and the court concluded that summary judgment for the

defendant was not warranted. Id. at *1, 5.

Even though the foregoing decisions indicated a need for factual

development on the permissible purpose issues as pleaded therein,

they support a conclusion that mere comparison shopping will, as a

matter of law, support a finding of no permissible purpose under 15

U.S.C. § 1681b(a)(3)(A); the question they generally sought to

resolve was whether the conduct at issue amounted to comparison

shopping or something more. See Boone, 2018 WL 588927, at *15;

Qureshi, 2016 WL 5372184, at *1-3; Heaton, 2015 WL 6744525, at *4;

Traveler, 2006 WL 173687, at *3-5. Such a conclusion is reinforced

by the fact that it is widely held that 15 U.S.C. § 1681b(a)(3)(A)

should be read fairly narrowly. The Seventh Circuit, for example,

has held:

> An entity may rely on subparagraph (3)(A) only
> if the consumer initiates the transaction. A
> third party cannot troll for reports, nor can
> it request a report on a whim. Rather, there must
> be a direct link between a consumer's search for
> credit and the bank's credit report request.

See Stergiopoulos & Ivelisse Castro v. First Midwest Bancorp, Inc.,

34

427 F.3d 1043, 1047 (7th Cir. 2005) (emphasis added). The Seventh Circuit's opinion has been cited broadly, and the view it represents has been adopted by many courts. See, e.g., Huertas v. Galaxy Asset Mgmt., 641 F.3d 28, 34 (3d Cir. 2011); Pintos v. Pac. Creditors Ass'n, 565 F.3d 1106, 1113 (9th Cir. 2009), amended by 605 F.3d 665, 670 (9th Cir. 2010); Boone, 2018 WL 588927, at *15; Sheridan v. AFNI, Inc., 3:14-cv-1251, 2015 WL 506573, at *4 (M.D. Tenn. Feb. 5, 2015); Bracken, 2014 WL 5527837, at *4-5; Lepelletier v. Fair Oaks Motors, Inc., 1:11-cv-1268, 2012 WL 7177149, at *1 (E.D. Va. Feb. 24, 2012). The Ninth Circuit has narrowly interpreted the Seventh Circuit's view, holding that "[t]he requirement that the consumer initiate the transaction is not satisfied simply because the consumer did something that arguably led to the creditor's claim," such as owning a vehicle that has been towed and impounded involuntarily by a defendant. See Pintos, 565 F.3d at 1110, 1113.

The Court finds the reasoning in two of the decisions set out above, Heaton and Boone, to be particularly instructive. First, in Heaton, the court reasoned:

> Here, the facts are far from undisputed as to whether Plaintiffs' actions on Defendants' website constituted a credit transaction, or whether such action simply constituted "comparison shopping" behavior, which the [FTC] has stated is not enough to rise to the level of a credit transaction under the FCRA. See Letter from David Medine to Karen Coffey (Feb. 11, 1998), 1998 WL 34323748 at *1 (FTC Staff Op. Ltr.) (transaction initiated by consumer only

35

when the consumer "clearly understands that he or she is initiating the purchase").[16]

Defendants correctly note that this Staff Opinion Letter answers a question regarding 15 U.S.C. § 1681b(a)(3)(F), the "legitimate business need" permissible purpose, which is not at issue in this case. . . .

However, the Court finds this letter persuasive, while not binding, for the singular purpose of interpreting what Congress meant by the phrase "credit transaction" in the statute at issue. Notably, the letter uses an example where the permissible purpose is a credit transaction under 15 U.S.C. § 1681b(a)(3)(A) to make its point. Letter from Medine to Coffey, 1998 WL 34323748 at *2 n.1. Similarly, the Ninth Circuit has viewed multiple sections of the FCRA together to understand what is required under a particular section, in accordance with general canons of statutory interpretation.

Heaton, 2015 WL 6744525, at *4 (citations omitted).

This Court has previously held that FTC Staff Opinion Letters, such as that cited by Heaton, are "informative" as to the interpretation of the FCRA (albeit not "entitled to the deference that is owed to a formal Commission Opinion"). Milbourne v. JRK Residential Am., LLC, 92 F. Supp. 3d 425, 431 (E.D. Va. 2015). And, the Heaton court's view finds support in the general principles set out in Stergiopoulos, 427 F.3d at 1047. Furthermore, both Qureshi and Traveler implicitly relied upon the 1998 FTC Letter in evaluating whether a permissible purpose had been established as a matter of

---

[16] The Court refers to this Letter as the 1998 FTC Letter.

law under 15 U.S.C. § 1681b(a)(3)(A). See Qureshi, 2016 WL 5372184, at *3; Traveler, 2006 WL 173687, at *3-5. Moreover, the FTC (like Heaton) has expressly applied the principles set forth in the 1998 FTC Letter to the "credit transaction" context. In a 2011 summary of its interpretations of the FCRA, the FTC explained in its commentary to 15 U.S.C. § 1681b(a)(3)(A) that no credit transaction has occurred where a consumer "simply asks for information about [products] and prices." See FTC, 40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations 45 (2011) [hereinafter FTC, 40 Years of Experience]. Accordingly, the Court adopts the reasoning of the Heaton court and concludes that comparison shopping behavior will not support a permissible purpose under 15 U.S.C. § 1681b(a)(3)(A).[17]

Second, in Boone, the court held:

> Section 1681b(a)(3)(A) "requires that the entity must be engaged in a credit transaction in which the consumer is participating." "An entity may rely on [section 1681b(a)(3)(A)] only if the consumer initiates the transaction.

---

[17] Miller cited the 1998 FTC Letter to support the proposition that comparison shopping behavior is insufficient to support a permissible purpose. See Pl.'s Opp'n *2-3. Dish Network asserts that the 1998 FTC Letter is not binding. Def. Reply Br. 3. That is true. But, as set out above and below, the Court finds its guidance persuasive. And, although Dish Network maintains that there are "contrary holdings by controlling courts on the same points," it does not cite any such decisions. See Def.'s Reply Br. 3. Rather, it simply states "[s]ee, supra" to support its contention. Def.'s Reply Br. 3. Nothing raised "supra" in Dish Network's reply brief, however, related to any of the principles set out in the 1998 FTC Letter.

A third party cannot troll for reports, nor can it request a report on a whim. Rather, there must be a direct link between a consumer's search for credit and the bank's credit report request." T-Mobile did not have a credit account with Boone and was not close to extending credit to Boone. According to the complaint, Boone was essentially window shopping.

Furthermore, Boone's contact with T-Mobile did not involve the extension of credit under the FCRA. The term "credit" is defined in the FCRA as it is defined in the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq. ("ECOA"). Thus, "credit" means "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor." T-Mobile was not extending Boone the right to defer payment on a transaction or debt. Boone had not initiated a transaction or sought to create a debt; he merely asked for price quotes.

The Third Circuit has found a "permissible purpose" under section 1681b(a)(3)(A) where a consumer owes a debt or applies for credit. In Huertas v. Citigroup, Inc., the Court held that "[section] 1681b(a)(3)(A) authorizes access to a consumer's credit report 'when the consumer applies for credit[.]'" In Huertas v. Galaxy Asset Management, the Court [sic] that a creditor had a permissible purpose under section 1681b(a)(3)(A) when a consumer sought credit, received credit, and accumulated debt. The complaint alleges that matters had not gone nearly that far. Boone did not apply for credit and did not accumulate debt with T-Mobile.

Boone, 2018 WL 588927, at *15 (citations omitted). The Court finds this analysis compelling, and it therefore adopts Boone's reasoning in addition to (and in support of) that of Heaton.

Additionally, the 1998 FTC Letter itself provides guidance that

38

directly relates to 15 U.S.C. § 1681b(a)(3)(A). Importantly, the
Letter states:

> For example, a [car] dealer may obtain a report
> [under 15 U.S.C. § 1681b(a)(3)(A)], if one is
> necessary, in order to arrange financing
> requested by the consumer. The dealer may also
> obtain a report to check a consumer's
> creditworthiness when the consumer presents a
> personal check to pay for the vehicle. By
> contrast, a permissible purpose would not arise
> if a consumer intends to pay by cash.

Letter from Medine to Coffey, 1998 WL 34323748, at *2. As explained
above, the Court finds FTC Staff Letters to be informative, and courts
have looked to this Letter for guidance in interpreting 15 U.S.C.
§ 1681b(a)(3)(A). The FTC recently reaffirmed the specific
conclusions cited above in its staff interpretation summary. See FTC,
40 Years of Experience 45, 48. Those conclusions also comport with
the principles set forth herein. Hence, the Court relies on them in
evaluating Dish Network's actions.

Given the foregoing discussion and analysis, this is an easy
case. Miller was, just like the named plaintiff in Boone,
"essentially window shopping," i.e., comparison shopping. See Boone,
2018 WL 588927, at *15. Dish Network "did not have a credit account
with [Miller] and was not close to extending credit to [Miller]."
See id. And, Miller "had not initiated a transaction or sought to
create a debt" and "did not apply for credit and did not accumulate
debt." See id. Miller's interactions with Dish Network were clearly

insufficient to support a permissible purpose under 15 U.S.C. § 1681b(a)(3)(A). See, e.g., Boone, 2018 WL 588927, at *15–16; Heaton, 2015 WL 6744525, at *4; FTC, 40 Years of Experience 45. Additionally, nothing in the First Amended Complaint suggests that Miller proposed to pay for Dish Network services on credit or with a check. Indeed, Miller did not apply for or request services at all. In short, the First Amended Complaint pleads that Dish Network had no permissible purpose under 15 U.S.C. § 1681b(a)(3)(A) to access Miller's credit report.

Furthermore, taking Miller's allegations as true, Dish Network could not have had a reason to believe that it intended to use Miller's credit report in connection with a credit transaction involving Miller and the extension of credit to him. See 15 U.S.C. § 1681b(a)(3)(A). As set out above, the "reason to believe" exception refers to factual, not legal, ambiguity. Nothing in the First Amended Complaint implies any factual ambiguity as to Miller's interactions with Dish Network. And, Miller alleges that Dish Network has a common practice of obtaining credit reports of consumers (such as Miller) who merely ask about prices and products, thereby further demonstrating that Dish Network did not obtain Miller's credit report with the reasonable belief that it intended to use the report for

40

a credit transaction purpose. First Am. Compl. *6.[18]

In sum, Miller has sufficiently alleged that Dish Network may not rely on 15 U.S.C. § 1681b(a)(3)(A) to defeat his claim at the motion to dismiss stage. Indeed, if Miller's allegations are not

---

[18] Dish Network's claims that Miller's allegations demonstrate that it had a reason to believe that it had a permissible purpose do not undermine these conclusions. First, as detailed above, the allegation that Miller "contacted Defendant and inquired about prices, features, and product availability" offers no support for Dish Network's position. See Def.'s Br. 10. Second, Dish Network's certification "to Equifax that it had a permissible purpose" does not show that Dish Network reasonably believed that it had a permissible purpose. See Def.'s Br. 10-11. In the vast majority of cases, the user of a credit report will have certified that it had a permissible purpose in accordance with 15 U.S.C. § 1681b(f)(2); the Court still must determine, pursuant to 15 U.S.C. § 1681b(f)(1), whether the user in fact had a permissible purpose. See 15 U.S.C. § 1681b(f). The Court declines to interpret the FCRA as assuming the infallibility of a user's certification because doing so would gut the FCRA and render meaningless the requirement under 15 U.S.C. § 1681b(f)(1) that a credit report actually be "obtained for a purpose for which the consumer report is authorized to be furnished under this section." See id. § 1681b(f)(1). And, in any case, Miller expressly alleges that Dish Network, in line with its general practice, certified that it had a permissible purpose when, in fact, it did not. First Am. Compl. *4, 6-7.

Furthermore, it may well be true, as Dish Network contends, that users of credit reports do not need "permission" to obtain them, that it is insufficient for a plaintiff to allege that he never sought to acquire services from the defendant, and that a plaintiff does not need to have direct dealings with a defendant for it to obtain a credit report lawfully. See Def.'s Br. 9-10. However, some action must give rise to a permissible purpose, and here Miller alleges that his only connection with Dish Network was to engage in comparison shopping behavior. That is not enough to allow a finding of permissible purpose. None of the cases Dish Network cites to bolster its view hold to the contrary. See Glanton, 172 F. Supp. 3d at 895-96; Gibbons v. GC Servs. LLC, 5:13-cv-84, 2013 WL 5371620, at *2 (E.D.N.C. Sept. 24, 2013); Wells v. Craig & Landreth Cars, Inc., 3:10-cv-376, 2011 WL 1542121, at *2-4 (W.D. Ky. Apr. 22, 2011).

rebutted, they are sufficient to support a finding that, as a matter of law, Dish Network had no permissible purpose for accessing his credit report under 15 U.S.C. § 1681b(a)(3)(A).

### c. 15 U.S.C. § 1681b(a)(3)(F)(i)

The analysis of the permissible purpose under 15 U.S.C. § 1681b(a)(3)(F)(i) is similar to that of the "credit transaction" permissible purpose. As explained, Miller alleges that his interactions with Dish Network simply involved comparison shopping behavior and that Dish Network ran his credit report (in accordance with its normal practice). The question is whether this comes within the ambit of 15 U.S.C. § 1681b(a)(3)(F)(i), which creates a permissible purpose where a user has reason to believe that it "otherwise has a legitimate business need for the [credit report] information . . . in connection with a business transaction that is initiated by the consumer." See 15 U.S.C. § 1681b(a)(3)(F)(i).

The same decisions that show that mere comparison shopping behavior cannot establish a permissible purpose under the "credit transaction" provision likewise demonstrate that such conduct cannot prove a permissible purpose under the "business transaction" provision. See Boone, 2018 WL 588927, at *14-15; Qureshi, 2016 WL 5372184, at *1-3; Traveler, 2006 WL 173687, at *1, 3-5; see also Heaton, 2015 WL 6744525, at *4 (relying on the 1998 FTC Letter, which mainly established principles applicable to the "business

transaction" permissible purpose, to interpret the "credit transaction" provision). And, in any event, each of these cases involved business interactions similar to, or much more advanced than, those at issue here.[19]

There seem to be fewer generalized judicial interpretations of the "business transaction" provision that are relevant here. All that the Fourth Circuit has had to say on the subject is that "[t]he terms 'legitimate business need' and 'in connection with' refer to the needs and objections of the individual to whom the report is furnished, not the needs of the person about whom the report is furnished." Korotki, 1997 WL 753322, at *2. But, that does not affect the question of whether comparison shopping behavior is sufficient to establish a legitimate business need in connection with a transaction initiated by the consumer.

Nevertheless, there is one non-judicial interpretation of 15 U.S.C. § 1681b(a)(3)(F)(i) more closely related to the context at issue here that is instructive and persuasive. In the 1998 FTC Letter referenced above, the FTC staff reasoned:

> [15 U.S.C. § 1681b(a)(3)(F)(i)] permits

---

[19] The Qureshi court also ruled, after trial, that the defendant had a permissible purpose under 15 U.S.C. § 1681b(a)(3)(F)(i). Qureshi, 2016 WL 6779320, at *5. But, again, the court found that the facts at the summary judgment stage were legally sufficient to support the plaintiffs' claim. And, as noted above, the parties in Qureshi had engaged in much more significant interactions than the parties in this case.

CRAs to provide consumer reports to any party who has a 'legitimate business need for the information in connection with a business transaction that is initiated by the consumer." You ask whether this provision allows a dealer to obtain a consumer report on a person who 'comes to an automobile dealership and requests information" from a salesman about one or more automobiles. In our view it does not, because a request for general information about products and prices offered does not involve a business transaction initiated by the consumer.

More generally, you ask "when is the beginning of a business transaction" initiated by the consumer? In responding to this question, it is important to note that [15 U.S.C. § 1681b(a)(3)(F)(i)] limits this "business need" permissible purpose to transactions (i) that are "initiated" by the consumer and (ii) where the seller has a "legitimate business need" for the information. The staff's view is that an automobile dealer may obtain a report only in those circumstances in which the consumer clearly understands that he or she is initiating the purchase or lease of a vehicle and the seller has a legitimate business need for the consumer report information in order to complete the transaction.

For example, a consumer who asks a dealer questions about prices and financing is not necessarily indicating an intent to purchase or lease a vehicle from that particular dealer. Nor does the dealer have a "legitimate" business need for a consumer report in this situation. The consumer may simply be comparison shopping. . . .

Only in those circumstances where it is clear both to the consumer and to the dealer that the consumer is actually initiating the purchase or lease of a specific vehicle and, in addition, the dealer has a legitimate business need for consumer report information may the dealer obtain a report without written

44

permission. In this regard, we note that
obtaining information for negotiation purposes
does not constitute a "legitimate" business
need. The dealer must have a specific need for
the information directly related to the
completion of the transaction. For example, a
dealer may obtain a report, if one is necessary,
in order to arrange financing requested by the
consumer. The dealer may also obtain a report
to check a consumer's creditworthiness when the
consumer presents a personal check to pay for
the vehicle. By contrast, a permissible purpose
would not arise if a consumer intends to pay by
cash.

Letter from Medine to Coffey, 1998 WL 34323748, at *1-2 (emphasis

added). The guidance of FTC Letters on the FCRA is informative.

Furthermore, each of the decisions noted above that shows that

comparison shopping will not support a permissible purpose under 15

U.S.C. § 1681b(a)(3)(F)(i) relied on the 1998 FTC Letter. See Boone,

2018 WL 588927, at *14-15; Qureshi, 2016 WL 5372184, at *3; Traveler,

2006 WL 173687, at *4-5; see also Heaton, 2015 WL 6744525, at *4.

And, again, the FTC reaffirmed the above principles in 2011. See FTC,

40 Years of Experience 48. Consequently, the Court finds the FTC's

guidance to be persuasive and adopts it here.

    In applying those principles, the Court deems Boone to be

precisely on point and instructive:

        The first alleged permissible purpose is
    that T-Mobile obtained the report "in
    connection with a business transaction that
    [was] initiated by the consumer" and for a
    "legitimate business need." The complaint does
    not establish, however, that Boone initiated a
    business transaction. Rather, Boone alleges

45

that he made a "general inquiry about the
availability of cell phone plans and rates,"
made it clear that he did not want his consumer
report to be accessed if a hard credit inquiry
was required, "did not initiate a transaction,"
and "never signed any agreement and never agreed
to any services from [T-Mobile]." Those actions
do     not     amount     to     a     "business
transaction . . . initiated by the consumer."
The [FTC] agrees. "[A] request for general
information about products and prices offered
does   not   involve   a   business   transaction
initiated by the consumer." For instance, a
consumer who asks a car dealer to "test drive"
a car, or asks questions about pricing and
financing, "is not necessarily indicating an
intent to purchase or lease a vehicle from that
particular dealer." Conducting a hard credit
inquiry is therefore inappropriate at this
stage.

Moreover, T-Mobile did not have a
"legitimate business need" to obtain Boone's
credit report. He asked only about prices and
financing. According to the FTC:

Only in those circumstances where it is
clear both to the consumer and to the dealer that
the   consumer   is   actually   initiating   the
purchase or lease of a specific vehicle and, in
addition, the dealer has a legitimate business
need for consumer report information may the
dealer   obtain   a   report   without   written
permission.

Such   circumstances   were   not   present
according to Boone's allegations. . . .

Boone, 2018 WL 588927, at *14-15 (citations omitted).

Here, as in Boone, the First Amended Complaint "alleges that

[Miller] made a 'general inquiry about the availability of [Dish

Network] plans and rates,' made it clear that he did not want his

consumer report to be accessed if a hard credit inquiry was required, 'did not initiate a transaction,' and 'never signed any agreement and never agreed to any services from [Dish Network].'" See Boone, 2018 WL 588927, at *14 (citations omitted). And, the allegations in First Amended Complaint indicate that it was not "clear both to [Miller] and to [Dish Network] that [Miller was] actually initiating the purchase [of a specific product] and, in addition, [that Dish Network had] a legitimate business need for [the] consumer report information." See id. at *14-15 (citations omitted).[20] Dish Network therefore had no permissible purpose under 15 U.S.C. § 1681b(a)(3)(F)(i).

Additionally, nothing in the First Amended Complaint suggests that Dish Network could have had a reasonable belief that it had a permissible purpose under the business transaction provision. That is because, as explained above, nothing in the First Amended Complaint implies any factual ambiguity as to the interactions between Dish Network and Miller. And, it was Dish Network's general practice to obtain credit reports of people in Miller's position (thereby further showing that it did not have a reasonable belief

---

[20] Courts have found that "a company has a 'legitimate business need' when it assesses a consumer's eligibility for a business service." See, e.g., Bickley v. Dish Network, LLC, 751 F.3d 724, 731 (6th Cir. 2014). However, even assuming that Dish Network was evaluating Miller's eligibility for services, there must have been a business transaction initiated by Miller. See id. at 732. There was no such transaction here.

that the credit information would be used in connection with a
business transaction initiated by Miller). See First Am. Compl.
*5-7.

For the foregoing reasons, Miller has sufficiently alleged that
Dish Network lacked a permissible purpose (or reasonable belief
thereof) under 15 U.S.C. § 1681b(a)(3)(F)(i). And, if Dish Network
cannot counter Miller's allegations, they permit a finding that, as
a matter of law, Dish Network had no permissible purpose under 15
U.S.C. § 1681b(a)(3)(F)(i).

### iii. The Other Elements of the 15 U.S.C. § 1681b(f) Claim

Dish Network raises no argument that Miller has failed to
satisfy the other elements of a claim under 15 U.S.C. § 1681b(f).
Because it is undisputed that Miller's First Amended Complaint meets
those elements, the Court does not address them.[21] Dish Network's
motion to dismiss as to the 15 U.S.C. § 1681b(f) claim will be denied.

### C.   The 15 U.S.C. § 1681n(b) Claim

Dish Network also asserts that Miller failed to state a claim
under 15 U.S.C. § 1681n(b). See Def.'s Br. 11. It is clear that 15
U.S.C. § 1681n(b) only provides a cause of action to credit reporting

---

[21] As to damages (which Dish Network only raises as part of its Fed.
R. Civ. P. 12(b)(1) arguments), Miller has alleged harm in the form
of emotional distress. That is cognizable as actual damages under
the FCRA. See, e.g., Robinson, 560 F.3d at 239; Freedom Plus/Cross
River, 2018 WL 770384, at *6.

agencies. See 15 U.S.C. § 1681n(b). Miller concedes that he is not

pursuing an individual claim under that provision. Pl.'s Opp'n *16.

Thus, there is no need further to address that aspect of Dish

Network's motion.[22] The motion will be granted as to this issue.

### III. Concluding Comments & Instructions to Miller

After reviewing Miller's papers in relation to Dish Network's

motion, there are several matters that the Court deems it necessary

to address, particularly given Miller's pro se status.

First, Miller's First Amended Complaint is difficult to

interpret. Miller presents his claims using a "kitchen sink" approach

that does not clearly delineate the theories of liability he is

actually presenting.[23] Accordingly, and in the interests of clarity

and judicial economy as this litigation proceeds, Miller is

instructed to submit a Second Amended Complaint that clarifies the

claims he is actually asserting and organizes those claims into

specified "Counts." He is further instructed to omit references to

facts, statutes, or other materials that do not form the basis of

---

[22] Miller suggests in his Opposition that he would like the Court to
refer Dish Network to the proper authorities for its violations of
15 U.S.C. § 1681n(b). That does not precisely align with the language
of the First Amended Complaint. See First Am. Compl. *10. To the
extent that Miller seeks such relief under 15 U.S.C. § 1681n(b), he
has no standing to do so (as explained above).

[23] The Court does not pass upon whether Miller has stated any claims
under theories other than those addressed in this Opinion.

his claims.

Second, the Court observes that Miller has attempted to incorporate by reference his Bill of Particulars (ECF No. 1-3) into his First Amended Complaint. First Am. Compl. *1. The Court by MEMORANDUM ORDER (ECF No. 17) required Miller to replead his claims pursuant to Fed. R. Civ. P. 81(c)(2). The Court considers it to be procedurally improper for an amended complaint to incorporate by reference a previous complaint that is no longer operative. And, in any case, such incorporation by reference can lead to substantial ambiguity as to what claims and allegations remain active. Therefore, Miller is instructed not to incorporate by reference previous complaints (including the Bill of Particulars) into any future complaints filed in this action. Miller must directly insert into any new complaints all content from previous complaints that he would like the Court to review.[24]

Third, Miller attempted to incorporate by reference his Opposition to Dish Network's first motion to dismiss (which was denied as moot by MEMORANDUM ORDER (ECF No. 17)) into his Opposition to the motion to dismiss at issue here. See Pl.'s Opp'n *4. That is procedurally improper, and Miller is instructed not to incorporate by reference previous papers into his briefs in the future.

---

[24] However, Miller may, of course, attach and incorporate by reference relevant evidentiary documents.

## CONCLUSION

For the foregoing reasons, Dish Network's MOTION TO DISMISS (ECF No. 20) will be granted in part and denied in part. It will be granted with respect to any request for relief that the Court refer Dish Network to the appropriate authorities. It will also be granted as to any claim raised pursuant to 15 U.S.C. § 1681n(b). The motion will be otherwise denied.

It is so ORDERED.

/s/ REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: July 31, 2018